ON PETITION FOR REHEARING
TJOFLAT, Circuit Judge:
We sua sponte vacate and reconsider our original opinion in this matter, reported at 760 F.3d 1195. We substitute in its place the following opinion.
The Governor of the State of Florida, other Florida officials, and members of the Board of Medicine of the Florida Department of Health (collectively, the “State”), appeal from the District Court’s grant of summary judgment and an injunction in favor of a group of physicians and physician advocacy groups (collectively, “Plaintiffs”) enjoining enforcement of Florida’s Firearm Owners Privacy Act[1] (the “Act”) on First and Fourteenth Amendment grounds.
Society has traditionally accorded physicians a high degree of deference due to *869 factors such as their superior knowledge, education, and “symbolic role as conquerors of disease and death.” Paula Berg, Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice, 74 B.U. L.Rev. 201, 226 (1994). This deference reaches its apex in the examination room. When a patient enters a physician’s examination room, the patient is in a position of relative powerlessness. The patient must place his or her trust in the physician’s guidance and submit to the physician’s authority.
With this authority comes responsibility. To protect patients, society has long imposed upon physicians certain duties and restrictions that operate to define the boundaries of good medical care. In keeping with this tradition, the State passed the Act.
The Act seeks to protect patient privacy by-restricting irrelevant inquiry and record-keeping by physicians on the sensitive issue of firearm ownership. The Act does not prevent physicians from speaking with patients about firearms generally. Nor does it prohibit specific inquiry or record-keeping about a patient’s firearm-ownership status when the physician determines in good faith, based on the circumstances of that patient’s case, that such information is relevant to the patient’s medical care or safety, or the safety of others.
Rather, the Act codifies the commonsense conclusion that good medical care does not require inquiry or record-keeping regarding firearms when unnecessary to a patient’s care — especially not when that inquiry or record-keeping constitutes such a substantial intrusion upon patient privacy. Given this understanding of the Act, and in light of the longstanding authority of States to define the boundaries of good medical practice, we hold that the Act is, on its face, a permissible restriction of physician speech. Plaintiffs remain free— as they have always been — to assert their First Amendment rights as an affirmative defense in any actions brought against them. But we will not, by striking down the Act, effectively hand Plaintiffs a declaration that such a defense will be successful.
Accordingly, we reverse the District Court’s grant of summary judgment in favor of Plaintiffs, and vacate the injunction against enforcement of the Act.
I.
On June 2, 2011, Florida Governor Rick Scott signed the Act into law. The Act created Fla. Stat. § 790.338, entitled “Medical privacy concerning firearms; prohibitions; penalties; exceptions,” and amended the Florida Patient’s Bill of Rights and Responsibilities, Fla. Stat. § 381.026, to include several of the same provisions. The Act also amended Fla. Stat. § 456.072, entitled “Grounds for discipline; penalties; enforcement,” to provide for disciplinary measures for violation of the Act. The Florida legislature passed the Act in response to complaints from constituents that medical personnel were asking unwelcome questions regarding firearm ownership, and that constituents faced harassment or discrimination on account of their refusal to answer such questions or simply due to their status as firearm owners.[2]
*870 The Act provides, in relevant part, that licensed health care practitioners and facilities (i) “may not intentionally enter” information concerning a patient’s ownership of firearms into the patient’s medical record that the practitioner knows is “not relevant to the patient’s medical care or safety, or the safety of others,” § 790.338(1); (ii) “shall respect a patient’s right to privacy and should refrain” from inquiring as to whether a patient or his or her family owns firearms, unless the practitioner or facility believes in good faith that the “information is relevant to the patient’s medical care or safety, or the safety of others,” § 790.338(2); (iii) “may not discriminate” against a patient on the basis of firearm ownership, § 790.338(5); and (iv) “should refrain from unnecessarily harassing a patient about firearm ownership,” § 790.338(6).[3]
*871 Violation of any of the provisions of the Act constitutes grounds for disciplinary action under § 456.072(2). Fla. Stat. § 456.072(l)(nn). Furthermore, “[violations of the provisions of subsections (1)-(4) constitute grounds for disciplinary action under [Fla. Stat. §§] 456.072(2) and 395.1055.” Fla. Stat. § 790.338(8). Thus, if the Board of Medicine of the Florida Department of Health (the “Board”) finds that a physician has violated the Act, the physician faces disciplinary measures including fines, restriction of practice, return of fees, probation, and suspension or revocation of his or her medical license. Fla. Stat. § 456.072(2). An investigation culminating in disciplinary action may be initiated against a physician by the Department of Health or may be triggered by a citizen’s complaint. Fla. Stat. § 456.073. The minutes of a June 2, 2011, meeting of the Rules/Legislative Committee of the Board indicate that the Board is prepared to initiate disciplinary proceedings against a physician who violates the Act, stating that “the Committee [has] determined [that] violation of [the Act] falls under failure to comply with a legal obligation and the current disciplinary guidelines for this violation would apply.” Fla. Bd. of Medicine Rules/Legislative Comm., Meeting Report, at 3 (Jun. 2, 2011), available at http://wwlO.doh.state.fl.us/pub/medicine/ AgendaMnfo/Public_Information/Public_ Minutes/2011/Committees/R-L/060211_ Minutes.pdf.
On June 6, 2011, four days after Governor Scott signed the Act into law, Plaintiffs filed a 42 U.S.C. § 1983 action against the State in the United States District Court for the Southern District of Florida, alleging that the inquiry, record-keeping, discrimination, and harassment provisions of the Act facially violate the First and Fourteenth Amendments of the United States Constitution, and seeking declaratory and injunctive relief. Plaintiffs contended that the Act imposes an unconstitutional, content-based restriction on speech, is over-broad, and is unconstitutionally vague.
On September 14, 2011, finding that Plaintiffs were likely to succeed on the merits, the District Court preliminarily enjoined enforcement of the inquiry, record-keeping, discrimination, and harassment provisions of the Act, together with the provisions providing for discipline of physicians who violate the Act. Wollschlaeger v. Farmer, 814 F.Supp.2d 1367, 1384 (S.D.Fla.2011).
On June 2, 2012, the District Court permanently enjoined enforcement of the inquiry, record-keeping, discrimination, and harassment provisions of the Act — together with the related disciplinary provisions — holding, on cross motions for summary judgment, that all four provisions facially violated the First Amendment, and that the inquiry, record-keeping, and harassment provisions of the Act were void for vagueness. Wollschlaeger v. Farmer, 880 F.Supp.2d 1251, 1267-69 (S.D.Fla.2012).
The District Court found that Plaintiffs had standing to sue because Plaintiffs were engaging in self-censorship to avoid potential disciplinary action, which constituted a cognizable injury-in-fact that was fairly traceable to the Act and redressable by injunction.. Id. at 1258-59. The District Court also held that Plaintiffs’ claims were ripe, finding that delayed review would “cause hardship to Plaintiffs, who would continue to engage in self-censorship,” and that further factual development of the issues was unnecessary. Id. at 1259.
*872 Turning to the merits, the District Court found that the Act imposed a content-based restriction on physicians’ speech on the subject of firearms. Id. at 1261: The District Court rejected the State’s argument that the Act “constitute^] a permissible regulation of professional speech or occupational conduct that imposed a mere incidental burden on speech.” Id. at 1262. The District Court noted that, unlike the provisions of the Act, “[s]uch regulations govern the access or practice of a profession; they do not burden or prohibit truthful, non-misleading speech within the scope of the profession.” Id.
The District Court then assessed the State’s asserted interests in passing the Act. The District Court acknowledged that the State has an interest in protecting its citizens’ Second Amendment right to keep and bear arms, but found that such a right is “irrelevant” to the Act and therefore is not “a legitimate or compelling interest for it.” 'Id. at 1264. The District Court found that, because the State acted on the basis of purely anecdotal information and provided no evidence that discrimination or harassment based on firearm ownership is pervasive, the State does not have a legitimate or compelling interest in protecting its citizens “from barriers to the receipt of medical care arising from [such] discrimination or harassment.” Id. (quotation marks omitted). However, the District Court found that Florida has legitimate— but perhaps not compelling — interests “in protecting patients’ privacy regarding their firearm ownership or use” and in the regulation of professions. Id. at 1265.
Balancing physicians’ free speech rights against the State’s legitimate interests in protecting patient privacy and regulating the professions, the District Court held that — regardless of whether strict scrutiny or some lesser standard applied — the inquiry, record-keeping, discrimination, and harassment provisions of the Act could not pass constitutional muster. Id. at 1265-67. The District Court found that the State had failed to provide any evidence that the confidentiality of information regarding patients’ firearm ownership was at risk, noting that a patient may simply decline to provide such information, and that state and federal laws pertaining to the confidentiality of medical records provide adequate protection to patients. Id. at 1267. With regard to the regulation of professions, the District Court found that the Act lacked “narrow specificity,” id. at 1266 (quotation marks omitted), because the Act directly targets speech rather than merely imposing an incidental burden on speech. Id. at 1266-67. For similar reasons, the District Court further found that the Act is not the least restrictive means of achieving the State’s interests. Id. at 1267. Thus, the District Court held that the “balance of interests tip significantly in favor of safeguarding practitioners’ ability to speak freely to their patients.” Id. at 1267.
The District Court also held that the inquiry, record-keeping, and harassment provisions of the Act were unconstitutionally vague. Id. at 1267-69. With regard to the inquiry and record-keeping provisions, the District Court found that the “relevance standard” failed to provide sufficient guidance as to what conduct the Act prohibits. Id. at 1268. With regard to the harassment provision, the District Court noted that the term “harass” has an ordinary meaning that is readily clear, id., but “[w]hat constitutes ‘unnecessary harassment’ is left to anyone’s guess,” id. at 1269. The District Court noted that it did not need to address Plaintiffs’ argument that the Act is overbroad because doing so would not change the outcome. Id. at 1270 n. 7.
Thus, the District Court — finding the remaining provisions of the Act severa- *873 ble — granted Plaintiffs’ motion for summary judgment, and granted in part and denied in part the State’s motion for summary judgment.[4] Id. at 1270. Accordingly, the District Court permanently enjoined the State from enforcing the record-keeping, inquiry, harassment, and discrimination provisions of the Act, § 790.338(1), (2), (5), (6), and from enforcing § 790.338(8), to the extent that it provided that violations of § 790.338(1) and (2) constitute grounds for disciplinary action, and § 456.072(l)(nn), to the extent that it provided that violations of § 790.338(1), (2), (5) and (6) constitute grounds for disciplinary action. Id.
On July 30, 2012, the State timely appealed the District Court’s judgment. We have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1291.
II.
We review a district court’s grant of summary judgment de novo. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir.2007). “Summary judgment is appropriate when ‘there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law.’ ” Id. (alteration in original) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists “if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.” United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir.1991) (quotation marks omitted).
We review a district court’s legal determinations de novo and ordinarily review its factual findings for clear error. In the context of the First Amendment, however, we conduct' an independent examination of the whole record, subjecting the District Court’s findings of ‘constitutional facts’ — those facts “that involve the reasons the [defendant] took the challenged action” — to de novo review. ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd., 557 F.3d 1177, 1206 (11th Cir.2009). We also review de novo questions concerning our subject matter jurisdiction, such as standing and ripeness. Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir.2006).
III.
We begin by taking up the issue of justiciability. The District Court found that Plaintiffs had standing to sue because they were engaging in self-censorship, which constituted a cognizable injury-in-fact fairly traceable to the Act and re-dressable by injunction. 880 F.Supp.2d at 1258-59. The State contends that this was error, because the Act does not prohibit physicians from asking patients about firearm ownership, providing firearm safety counseling, or recording information concerning patients’ firearm ownership. The State argues that physicians may engage in such conduct when it is relevant to patients’ care, and even when not relevant, the Act merely suggests that physicians “should refrain” from inquiring as to firearm ownership. Fla. Stat. § 790.338(2). Such hortatory language, the State argues, does not constitute a mandate that physicians must not inquire. Thus, the State argues, because the Act does not in fact actually prohibit the conduct Plaintiffs wish to engage in, Plaintiffs lack standing to challenge the Act because they have not demonstrated injury-in-fact. Moreover, the State argues, we have an obligation to *874 read the Act as a mere recommendation that physicians refrain from irrelevant inquiry and record-keeping about firearms, in order to construe the Act as valid.
We find that the District Court properly held that Plaintiffs’ claims are justiciable. In order to have standing, “a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant’s challenged behavior; and likely to be redressed by a favorable ruling.” Davis v. FEC, 554 U.S. 724, 733; 128 S.Ct. 2759, 2768, 171 L.Ed.2d 737 (2008). However, “[standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.” Id. at 734, 128 S.Ct. at 2769 (citations omitted) (quotation marks omitted).
At the outset, we note that Plaintiffs’ First Amendment challenge to the Act may be viewed as the functional equivalent of a First Amendment argument raised as an affirmative defense in a hypothetical case brought against a physician for asking irrelevant questions about firearms contrary to good medical practice. A physician could raise such a defense in a disciplinary proceeding brought under the Act for such conduct, or, for that matter, in a malpractice action brought in court for such conduct. For example, a patient could file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about firearm ownership — just as a patient could potentially file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about any other topic. The physician could choose to admit to the purportedly harassing speech and plead the First Amendment as an affirmative defense, in effect contending that the court’s rejection of the affirmative defense would constitute state action in violation of the Constitution. Indeed, leaving aside the Act, a physician facing malpractice liability for a wide swath of professional activity involving speech could theoretically raise a First Amendment defense.
In mounting a facial challenge to the Act, however, Plaintiffs sought a First Amendment defense to any action brought against a physician based on speech targeted by the Act. The State contends that the only proper vehicle for Plaintiffs’ First Amendment defense is a live proceeding brought under the Act. In other words, in arguing that Plaintiffs’ facial challenge is not justiciable, the State is saying that Plaintiffs must wait until they have been subjected to discipline pursuant to the Act.
Crucial to resolving the standing question is the nature of Plaintiffs’ claims. “Under controlling case law, we apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced.” Harrell v. The Fla. Bar, 608 F.3d 1241, 1254 (11th Cir.2010) (citing Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 760 (11th Cir.1991)).
Plaintiffs’ sole alleged injury is self-censorship, which may be a cognizable injury-in-fact for standing purposes. See id. (“[I]t is well-established that ‘an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.’ ” (quoting Pittman v. Cole, 267 F.3d 1269, 1283 (11th Cir.2001))).
To establish a cognizable self-censorship injury for the purposes of a First Amendment claim, a plaintiff “must show that, as a result of his desired expression, (1) he was threatened with prosecution; (2) prosecution is likely; or (3) *875 there is a credible threat of prosecution.” Id. at 1260 (internal quotation marks omitted). If a plaintiff proceeds under the eredible-threat-of-prosecution prong, he must demonstrate: “[FJirst, that he seriously wishes to engage in expression that is at least arguably forbidden by the pertinent law, and second, that there is at least some minimal probability that the challenged rules will be enforced if violated.” Id. (emphasis omitted) (citations omitted) (quotation marks omitted). “If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred.” Id. at 1257.
Plaintiffs explain that, as part of the practice of preventative care, some physicians routinely ask patients whether they own firearms — either verbally or via a screening questionnaire — and provide firearm safety counseling, as part of a larger battery of questions and counseling regarding health and safety risks (including, for example, poisonous chemicals in the home, alcohol, tobacco, and swimming pools). After passage of the Act, Plaintiffs have curtailed or eliminated this practice for fear of facing discipline.[5]
Plaintiffs have established that they wish to engage in conduct that is at least arguably forbidden by the Act. In their practice of preventative medicine, Plaintiffs wish to ask questions and record information regarding firearms as a matter of routine — without making a particularized determination of relevance — which implies that some such inquiry and recor-dation will not be relevant to the health and safety of patients or others and thus would be prohibited by the Act. The Act was recently enacted, and the State is defending it, so we may infer that there is at least some probability that the Act will *876 be enforced if violated.[6] Thus, Plaintiffs have established a cognizable self-censorship injury for their First Amendment claims.[7]
Similarly, to establish a cognizable self-censorship injury for the purposes of a vagueness claim, a plaintiff must show that: “(1) he seriously wishes to [speak]; (2) such [speech] would arguably be affected by the rules, but the rules are at least arguably vague as they apply to him; and (3) there is at least a minimal probability that the rules will be enforced, if they are violated.” Id. at 1254 (emphasis omitted) (footnote omitted) (citations omitted). Notably, “it is the existence, not the imposition, of standardless requirements that causes [the] injury.” Id. (alteration in original) (quoting CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1275 (11th Cir.2006)).
For the reasons discussed above, Plaintiffs have met the first and third prongs. With regard to the second prong, Plaintiffs argue that it is unclear whether routine inquiries and record-keeping regarding firearms, made as part of the practice of preventative medicine and not based on patients’ particularized circumstances, qualify as “relevant” to health and safety,- and that the law does not define the terms “unnecessarily harassing” or “discriminate,” leaving physicians without guidance as to what conduct the Act prohibits and when physicians may be subject to discipline for conduct patients may unpredictably deem objectionable. Without determining, at this stage, the ultimate merits of Plaintiffs’ argument, we accept that the language Plaintiffs point to is at least arguably vague. Thus, Plaintiffs have established a cognizable self-censorship injury for their vagueness claim.
Plaintiffs claim that they curtailed their firearms inquiry and counseling practices due to the Act, and that they would resume those practices but for the Act. Thus, Plaintiffs’ self-censorship injury is fairly traceable to passage of the Act, and re-dressable by injunction. Accordingly, Plaintiffs have standing.
The State argues that Plaintiffs lack standing with regard to the inquiry provision of the Act because the provision in fact prohibits nothing at all. Thus, the State claims, Plaintiffs’ fear that they will face discipline is not objectively reasonable. See Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir.1998) (“A party’s subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable.”). Under the State’s proposed construction, the Act merely recommends that physicians “should refrain” from asking questions about firearms unless relevant, and that such hortatory language does not constitute a bar on speech. The State points out that the Executive Director of the Board stated in a letter— *877 posted to the Board’s website shortly after Plaintiffs filed suit — that the Board does not interpret the inquiry provision as a prohibition, but rather as a recommendation (contradicting a letter the Executive Director had previously mailed to Florida physicians stating the opposite). Accordingly, the State contends, there is no credible threat of enforcement with regard to the inquiry provision.
We disagree. Laws — such as the Act — that provide for disciplinary action in ease of violation should generally not be interpreted as hortatory. Compare Liesegang v. Sec’y of Veterans Affairs, 312 F.3d 1368, 1377 (Fed.Cir.2002) (“In the absence of any consequences for noncompliance, [a law’s] timing provisions are at best precatory rather than mandatory.”), with Kittay v. Kornstein, 230 F.3d 531, 538 n. 3 (2d Cir.2000) (noting that attorney disciplinary rules “are mandatory in character” because they “state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action” (quotation marks omitted)), and Edwards v. Born, Inc., 792 F.2d 387, 391-92 (3d Cir.1986) (noting that attorney disciplinary rules “are mandatory” because attorneys are subject to discipline for violating them). Thus, despite the Board’s position — insofar as the Executive Director’s letters represent it — that the inquiry provision constitutes a recommendation rather than a mandate, the fact that the Act provides for disciplinary action against Plaintiffs in case of a violation provides evidence that Plaintiffs’ fear that they may face discipline is objectively reasonable for standing purposes. Notably, this is not a generalized fear of disciplinary action, but rather a specific apprehension by a specific group — physicians— whose conduct the Act targets. But cf. Clapper v. Amnesty Int'l USA 568 U.S. -, 133 S.Ct. 1138, 1143, 185 L.Ed.2d 264 (2013) (holding that attorneys and various human rights, labor, legal, and media organizations cannot “manufacture standing” to challenge a provision of the Foreign Intelligence Surveillance Act of 1978 “by choosing to make expenditures based on hypothetical future .harm” where plaintiffs merely speculate that the government will target their communications, and so the costs they incurred were a product of their generalized fear of surveillance).
Moreover, we note that the Board has not been consistent in its position that the inquiry provision is hortatory, as indicated by the Executive Director’s first letter stating the contrary. The State is also inconsistent in its interpretation of the “should refrain” language in its briefs. For instance, it repeatedly characterizes identical language in the harassment provision of the Act as a mandatory prohibition against unnecessary harassment. State’s Br. at 1, 6, 18, 27, 35 n. 8, 39. It also describes the inquiry provision itself as “proscribing] ... inquiries,” id. at 11, and “prohibiting] conduct,” id. at 39. Cf. Wilson, 132 F.3d at 1428-29 (holding that disbarred attorneys lacked standing to challenge State Bar rules that limit the ways in which disbarred attorneys can represent themselves to the public or have contact with clients where “the State Bar ha[d] repeatedly and consistently taken thé position that the [challenged rules] ha[d] no application to the types of scenarios the disbarred attorneys have posed”).
Neither is it controlling that, as the State contends, the Florida Supreme Court interpreted the term “should” as hortatory in reviewing Florida’s Code of Judicial Conduct. See In re Code of Judicial Conduct, 643 So.2d 1037, 1041 (Fla.1994). Such interpretation is irrelevant to determining what effect the Florida legislature intended to give language in the Act. Thus, Plaintiffs’ fear that they may *878 face discipline under the inquiry provision is objectively reasonable.[8]
The State also argues that Plaintiffs lack standing with regard to the record-keeping provision of the Act because it only proscribes the entry of firearm information that is not relevant to medical care or safety, and Plaintiffs claim no injury arising from a wish to record irrelevant information. However, Plaintiffs claim an injury to their practice of preventative medicine arising from not being free to record the firearm information of every patient as a matter of course. Some— perhaps the majority — of these records will therefore be irrelevant to the care and safety of patients and others. Thus, the State’s argument is unavailing: Plaintiffs claim an injury arising, in part, from a desire to record irrelevant information.
Accordingly, we find that the District Court properly held that Plaintiffs have standing to challenge the Act. We also find that the District Court properly held that Plaintiffs’ claims are ripe for adjudication.[9]
IV.
Now for the merits of Plaintiffs’ claims. Plaintiffs’ facial attacks on the Act arise under two separate provisions of the Constitution. First, they contend that § 790.338(1), (2), (5), (6) — the record-keeping, inquiry, discrimination, and harassment provisions of the Act[10] — impermissi-bly trench upon their rights under the First Amendment. In their view, the Act is a content-based restriction on speech and as such, is subject to — and fails — strict scrutiny. Plaintiffs also assert that the Act is overbroad; that is, they claim that even if the Act’s regulation of speech is constitutional in a limited number of situations, it nonetheless proscribes a substantial amount of legitimate speech, and must fall. Second, Plaintiffs argue that the Act violates their rights under the Due Process Clause of the Fourteenth Amendment, in that the Act’s terms are so vague that they fail to put a person of ordinary intelligence on notice as to what the Act prohibits.
We will begin with the latter contention and then move to the First Amendment challenges. See Borgner v. Brooks, 284 F.3d 1204, 1208 (11th Cir.2002) (“Before analyzing [the challenged state statute] under the [appropriate level of First Amendment scrutiny], we must first determine whether the statute, taken as a whole, is clear as far as what is required and what is prohibited.”).
A.
Under “[t]he void-for-vagueness doctrine[,] ... ‘a statute which either *879 forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.’ ” Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1310 (11th Cir.2009) (third alteration in original) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 629, 104 S.Ct. 3244, 3256, 82 L.Ed.2d 462 (1984)). Thus, a statute is unconstitutionally vague if “it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.” Giaccio v. Pennsylvania, 382 U.S. 399, 402-03, 86 S.Ct. 518, 520-21, 15 L.Ed.2d 447 (1966).
The Supreme Court has explained that “standards of permissible statutory vagueness are strict in the area of free expression.” NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963). Nonetheless, “perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.” Ward v. Rock Against Racism, 491 U.S. 781, 794, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661 (1989) (citation omitted); see also Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d-222 (1972) (“Condemned to the use of words, we can never expect mathematical certainty in our language.”). As such, “speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.” Hill v. Colorado, 530 U.S. 703, 733, 120 S.Ct. 2480, 2498, 147 L.Ed.2d 597 (2000) (citation omitted) (quotation marks omitted).
We begin by setting forth our understanding of the meaning of each of the challenged provisions, after which we address Plaintiffs’ specific contentions. See Broadrick v. Oklahoma, 413 U.S. 601, 617 n. 16, 93 S.Ct. 2908, 2919, 37 L.Ed.2d 830 (1973) (“[A] federal court must determine what a state statute means before it can judge its facial constitutionality.”). We do so in light of the familiar principle that where a statute is “readily susceptible to a narrowing construction that avoids constitutional infirmities,” we must uphold it. See Fla. Right to Life, Inc. v. Lamar, 273 F.3d 1318, 1326 (11th Cir.2001).
1.
The record-keeping provision prohibits physicians from “intentionally entering] any disclosed information concerning firearm ownership into the patient’s medical record if the [physician] knows that such information is not relevant to the patient’s medical care or safety, or the safety of others.” Fla. Stat. § 790.338(1). We note three salient points with regard to this provision. First, the substantive prohibition contained in the first clause— that a physician may not “intentionally enter any disclosed information concerning firearm ownership,” id.—is conditioned on a relevancy requirement in the second clause. See New Oxford American Dictionary 865 (3d ed.2010), available at http:// www.oxforddictionaries.com/definition/ american_english/if (defining “if,” in the first sense, as a conjunction which “intro-duc[es] a conditional clause”). The substantive prohibition applies only when the condition in the second clause is met—i.e., when a physician knows that information concerning firearm ownership is not relevant to the patient’s medical care or safety, or the safety of others. Logically, when a physician does not know that information concerning firearm ownership is irrelevant to the patient’s medical care or *880 safety, or the safety of others, the prohibition does not apply.
Second, and relatedly, the statute is written to require a high degree of certainty as to non-relevance on the part of the physician before the prohibition takes effect. By its terms, the provision only prohibits physicians from entering information concerning firearm ownership when the physician has knowledge of irrelevance. Any mental state regarding irrelevance that does not rise to the level of knowledge would not trigger the prohibition.
Finally, of course, if the prohibition applies only when a physician knows the information to be irrelevant, then the critical issue is the meaning of the relevancy requirement. Plaintiffs argue that the provision is vague because it does not provide them with sufficient notice as to when record-keeping regarding firearms is relevant to medical care or safety. Plaintiffs note that the Act does not specify whether a physician must make a particularized finding of relevance for each patient or whether a physician’s general belief that firearms are always relevant will suffice. They also argue that the Act does not specify if a physician must believe that firearm information is relevant at the time of inquiry and record-keeping, or if a good-faith belief that the information may later become relevant (such as in the practice of preventative medicine) satisfies the requirements of the Act. Plaintiffs contend that, because a reading that information about firearms is always relevant would render the Act meaningless, physicians reasonably fear that the Act requires some higher, unspecified level of relevance.
We find that recourse to plain meaning resolves the issue. See Johnson v. Governor of Fla., 405 F.3d 1214, 1247 (11th Cir.2005) (en banc) (“The first step in statutory interpretation requires that courts apply the plain meaning of the statutory language unless it is ambiguous.”). “Relevant” means “[r]elated to the matter at. hand; to the point; pertinent.” American Heritage Dictionary of the English Language 1098 (William Morris ed., 1969). We agree that the Act’s relevancy requirement, does not have a neat, one-size-fits-all definition; rather, relevancy is necessarily determined on a case-by-case basis. That is, whether information is related to the matter at hand depends entirely on the specifics of the matter at hand. A reading that information about firearm ownership is relevant in every case would, indeed, render the record-keeping provision superfluous, but this problem is easily avoided by adhering to a plain-meaning construction of relevancy as an ad hoc determination, requiring a physician to base his or her calculation as to the relevancy of a patient’s firearms-ownership status on particularized information about the patient. By employing a flexible relevancy, standard, the Act provides physicians with the freedom to record information regarding firearm ownership whenever doing so would be part of the practice of good medicine.
Taking these three points together, we think the record-keeping provision stands for the simple proposition that a physician may not record a patient’s firearm-ownership status unless the physician believes that — because of some particularized information about the individual patient, for example, that the patient is suicidal or has violent tendencies — the patient’s firearm-ownership status pertains to the patient’s medical care or safety, or the safety of others. The record-keeping provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.
2.
The inquiry provision is phrased slightly differently, but we think it is sub *881 stantially similar to the record-keeping provision in terms of its practical effect. This provision directs physicians to
refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a [physician] ... that in good faith believes that this information is relevant to the patient’s medical care or safety, or the safety of others, may make such a verbal or written inquiry.
Fla. Stat. § 790.338(2).
Here again, the substantive prohibition is qualified by a relevancy requirement, effectively providing that physicians may inquire whenever they believe in good faith that firearm ownership information is relevant to medical care or safety. Again, the provision sets a high bar as to the mental state necessary to trigger the prohibition: a physician must lack any good-faith belief as to the relevancy of the information. The provision does not require physicians to have knowledge of relevance before speaking, but only a good-faith belief as to relevance. Although this is phrased differently than the record-keeping provision’s relevancy requirement, we think the two provisions form two sides of the same coin. The prohibitions apply when a physician knows the information to be irrelevant and do not apply if the physician has a good-faith belief that the information is relevant.
And, as with the record-keeping provision, the relevancy clause is also key here. Plaintiffs again assert that the term “relevant” is vague, but as we observed above, in context, this requirement simply means that a physician should base his or her calculation as to the relevancy of a patient’s ownership of firearms on particularized information about the patient. Thus, a physician may make inquiries as to the firearms-ownership status of any or all patients, so long as he or she does so with the good-faith belief — based on the specifics of the patient’s case — that the inquiry is relevant to the patient’s medical care or safety, or the safety of others. If, for example, the physician seeks firearm information to suit a personal agenda unrelated to medical care or safety, he or she would not be making a “good-faith” inquiry, and so the Act plainly directs him to refrain from inquiring.
Accordingly, we conclude that the inquiry provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.
3.
Finally,[11] the harassment provision also contains the same basic elements as the first two provisions, albeit with a few modifications. The harassment provision directs physicians to “refrain from unnecessarily harassing a patient about firearm ownership during an examination.” Fla. Stat. § 790.338(6). Like the record-keeping and inquiry provisions, the harassment provision does not impose a flat ban on the speech at issue, but rather qualifies its ban — here, with a necessity requirement. Under the terms of the statute, physicians are only prohibited from harassing patients about firearm ownership when such harassmeht is unnecessary.
One way in which the harassment provision differs from the previous two *882 provisions, however, is with regard to the mental-state standard that triggers the substantive prohibition. Instead of imposing a high bar before prohibiting the speech — requiring knowledge of irrelevance or the absence of a good-faith belief of relevance — the harassment provision flips this formula, imposing a relatively high bar before permitting the speech. Harassment about firearm ownership is only permitted when necessary. We are not troubled by this inversion, however, because although, as we discuss below, we can imagine scenarios in which “harassment” might be warranted, even advisable, we think that in the majority of cases, it will not be. Imposing a more rigorous standard before permitting record-keeping or inquiry might present a more difficult question, .but we do not think it inappropriate as a prerequisite to permitting “harassing.”
Finally, we think that the necessity requirement, like the record-keeping and inquiry provisions, when read in the context of the provision and the Act as a whole, also has the effect of requiring a particularized determination by the physician as to relevance. See Young v. Progressive Se. Ins. Co., 753 So.2d 80, 84 (Fla.2000) (“[A]ll parts of a statute must be read together in order to achieve a consistent whole,” and “ ‘[w]here possible, courts must give effect to all statutory provisions and construe related statutory provisions in harmony with one another’ ”), cited with approval in Borgner, 284 F.3d at 1208.
Two points inform this conclusion. First, the harassment provision contains an explicit temporal ’limitation: unnecessary harassment is prohibited “during an examination.” Fla. Stat. § 790.338(6). Since the purpose of a medical examination is the provision of medical care, it seems logical to assume that if any harassment is permissible within that context, it must be related to the purpose of the medical examination. Second, the relevancy requirements present in both the record-keeping and inquiry provisions illuminate the meaning of the necessity requirement in the harassment provision. These requirements manifestly turn on a particularized determination by the physician as to the relevancy of the speech to the medical care or safety of the patient, or the safety of others. While that link is not made explicit in connection with the necessity requirement, the clear implication, given this pattern, is that the necessity requirement is directed to the same object: the medical care or safety of the patient, or the safety of others.
Plaintiffs express concern that the relevancy determination will hinge solely on a particular patient’s subjective understanding of what constitutes “unnecessary harassment,” and that as a result, they may be subjected to liability or discipline on an arbitrary basis. Were this indeed the ease, the provision would likely be invalid. See Conant v. Walters, 309 F.3d 629, 639 (9th Cir.2002) (holding a statute providing for administrative action against physicians who engage in speech that “the patient believes to be a recommendation of marijuana” lacks the requisite narrow specificity under the First Amendment); see also Thomas v. Collins, 323 U.S. 516, 535, 65 S.Ct. 315, 325, 89 L.Ed. 430 (1945) (striking on First Amendment grounds a statute criminalizing solicitation of membership for certain unions without state license because the statute did not distinguish between solicitation and advocacy, and so “put[ ] the speaker ... wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning”).
Again, we find the plain meaning of the term sufficient to dispel these fears. “Ha *883 rass” means “[t]o disturb or irritate persistently.” American Heritage Dictionary of the English Language 600 (William Morris ed.1969). When read in the context of the Act as a whole, the harassment provision communicates that physicians should not disparage firearm-owning patients, and should not persist in attempting to speak to the patient about firearm ownership when the subject is not relevant to medical care or safety. Like the other provisions of the Act, the harassment provision targets physicians who wish to pursue an agenda unrelated to medical care or safety.
Although the District Court found the modifier “unnecessarily” to be problematic, we disagree. The modifier in fact allows physicians the freedom to challenge — -i.e., “harass” — patients regarding firearms when, under the particularized circumstances of the patient’s case, doing so is necessary for health or safety reasons, even if the patient might find the physician’s advice unwelcome. For example, if a patient is suicidal, a physician may wish to attempt to persuadé the patient to remove firearms from the patient’s home, even if the patient initially objects. So even if the patient considers the physician’s health and safety advice related to firearms to be harassing, the inclusion of the modifier “unnecessarily” leaves room for physicians to deliver such advice when necessary to medical care or safety, consistent with the Act’s other provisions. The harassment provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.
As a final point, we note that patients by themselves cannot subject physicians to discipline. Patients may file a complaint which triggers an investigation by the Board, or they may bring a malpractice action, but so long as a physician is operating in good faith within the boundaries of good medical practice, and is providing only firearm safety advice which is relevant and necessary, he or she need not fear discipline at the hands of the Board or a money judgment in a court of law.
4.
To summarize, we read the Act to prohibit record-keeping about firearm ownership only when the physician knows such information to be irrelevant to the patient’s medical care or' safety, or the safety of others; inquiry about firearm ownership only when the physician lacks a good-faith belief that the information is relevant to the patient’s medical care or safety, or the safety of others; and harassment about firearm ownership only when the physician does not believe it necessary to the patient’s medical care or safety, or the safety of others.
Having determined that the record-keeping, inquiry, and harassment provisions are of sufficient clarity to conform to the requirements of due process, we hold that the District Court erred in finding them void for vagueness.
B.
We turn now to the first of Plaintiffs’ First Amendment challenges. We need only proceed to apply First Amendment scrutiny to the Act if it regulates activity that falls within the ambit of the First Amendment’s protections. Therefore, we begin our analysis by resolving a necessary preliminary issue: whether any of the challenged' provisions implicate a significant amount of “speech” as that term is understood in the context of First Amendment law.
1.
Under the First and Fourteenth Amendments, States are prohibited from “mak[ing] [any] law ... abridging the freedom of speech.” U.S. Const. *884 amend. I.[12] “The First Amendment literally forbids the abridgment only of ‘speech,’ but we have long recognized that its protection does not end at the spoken or written word.” Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989). Conduct may also be “sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.” Spence v. Washington, 418 U.S. 405, 409, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). To determine whether particular conduct implicates the protections of the First Amendment, we look to whether it is “inten[ded] to convey a particularized message,” and whether, under the circumstances, it is highly likely “that the message would be understood by [observers].” Johnson, 491 U.S. at 404, 109 S.Ct. at 2539 (quoting Spence, 418 U.S. at 410-11, 94 S.Ct. at 2730).
It would seem under this definition— indeed, under almost any measure — that asking questions and writing down answers constitute protected expression un-. der the First Amendment. However, the State argues that the Act escapes First Amendment scrutiny because it is directed toward conduct — the practice of medicine. While seemingly conceding (as it must) that asking questions and writing down answers would receive First Amendment protection if it occurred between strangers on a street corner, the State asserts that because the activity is conducted by a physician as part of the practice of the medical profession, and because the medical profession has long been subject to close regulation by the State, the fact that the law restricts oral and written communication is of no consequence whatever.
The State finds support for this proposition in Locke v. Shore, 634 F.3d 1185 (11th Cir.2011). In that case, we said that “[a] statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation.” Id. at 1191 (quoting Accountant’s Soc. of Va. v. Bowman, 860 F.2d 602, 604 (4th Cir.1988)). That is true so far as it goes, but the State’s proffered interpretation begs the question we must answer here. An inhibition of professionals’ freedom of speech does not violate the First Amendment “so long as ” it is “merely the incidental effect of ... an otherwise legitimate regulation.” Id. (emphasis added). The State’s analysis proceeds at such a high level of generality that all laws regulating the practice of a profession would necessarily impose only incidental burdens on speech, and so would always pass muster under the First Amendment. This cannot be the case.
The State also cites Justice White’s concurring opinion in Lowe v. SEC, 472 U.S. 181, 211-36, 105 S.Ct. 2557, 2573-86, 86 L.Ed.2d 130 (1985), but we do not find anything in that opinion that would countenance the idea that the entire category of professional regulation touches only on conduct, and thus lies beyond the reach of the First Amendment. Indeed, Justice White recognized that “[a]t some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment.” Id. at 230, 105 S.Ct. at 2583; see also Holder v. Humanitarian Law Project, 561 U.S. 1, 28, *885 130 S.Ct. 2705, 2724, 177 L.Ed.2d 355 (2010) (explaining that when “the conduct triggering coverage under [a] statute consists of communicating a message ... we must [apply] a more demanding standard” of scrutiny than that applied to regulations of noncommunicative conduct (second modification in original)); Miller v. Stuart, 117 F.3d 1376, 1382 (11th Cir.1997) (holding that a state may not insulate a regulation of commercial speech from First Amendment review simply by classifying the speech as part of the profession of accountancy); King v. Governor of N.J., 767 F.3d 216, 228-29 (3d Cir.2014) (rejecting the argument that verbal communications become “conduct” when they are used to deliver professional services), cert. denied 575 U.S. -, 135 S.Ct. 2048, 191 L.Ed.2d 955 (2015).
Our task, then, is to determine whether any provision of the Act crosses the boundary between a law regulating professional conduct with an incidental effect on speech, and a law regulating protected speech, which “must survive the level of scrutiny demanded by the First Amendment.” Lowe, 472 U.S. at 230,105 S.Ct. at 2583 (White, J., concurring).
The record-keeping provision of the Act, § 790.338(1), prohibits physicians from “intentionally entering] any disclosed information concerning firearm ownership into the patient’s medical record” under certain circumstances. This provision clearly targets activity—making an entry in a medical record—that is intended to convey a particular message— information about firearm ownership. And, (legibility aside) we think that under the circumstances it is highly likely that the expressive content contained in these entries would be understood by those viewing them. Therefore, we hold that the record-keeping provision regulates speech, and as such, must survive some level of First Amendment scrutiny.
The inquiry provision of the Act, § 790.338(2), requires physicians to “refrain from making a written inquiry or asking questions concerning the ownership of a firearm....” On its face, this provision also inhibits protected speech—inquiring about firearm ownership. It too must survive some level of First Amendment scrutiny.
The discrimination provision of the Act, § 790.338(5), if not a horse of a different color, is at least a different shade steed. This provision prohibits “discrimi-nat[ion] against a patient based solely upon the patient’s exercise of the constitutional right to own and possess firearms or ammunition.” Id. Unlike the first two provisions considered, the discrimination provision does not facially implicate a substantial amount of protected speech. Of course, it is possible to discriminate via speech, by hanging a sign on the examination room wall proclaiming “Gun Owners Not Welcome Here,” for example. But this does not transform antidiscrimination laws into restrictions on speech. See Rumsfeld v. Forum for Acad. & Inst’l Rights, Inc., 547 U.S. 47, 62, 126 S.Ct. 1297, 1308, 164 L.Ed.2d 156 (2006) (“Congress, for example, cán prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading ‘White Applicants Only’ hardly means that the law should be analyzed as one regulating the employer’s speech rather than conduct.”); accord Wisconsin v. Mitchell, 508 U.S. 476, 487-88, 113 S.Ct. 2194, 2201, 124 L.Ed.2d 436 (1993) (compiling cases upholding state and federal antidiscrimi-nation laws against First Amendment challenge). The provision does not single out speech, or target speech that carries a specific message; rather “the focal point of *886 its prohibition [is] the act of discriminating against individuals in the provision of [medical treatment] on the proscribed ground[ ].” See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 572, 115 S.Ct. 2338, 2347, 132 L.Ed.2d 487 (1995). Especially in light of the facial nature of Plaintiffs’ challenge — we hold that the discrimination provision is a regulation of conduct with only an incidental effect on speech. As such, it does not implicate, let alone offend, the First Amendment.
The harassment provision of the Act, § 790.338(6), requires physicians to “refrain from unnecessarily harassing a patient about firearm ownership.... ” Plaintiffs point us to Saxe v. State Coll. Area Sch. Dist., which stands for the proposition that “[t]here is no categorical ‘harassment exception’ to the First Amendment’s free speech clause.” 240 F.3d 200, 204 (3d Cir.2001) (Alito, J.) Of course, “non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause,” but the First Amendment also “protects a wide variety of speech that listeners may consider deeply offensive....” Id. at 206; see, e.g., Snyder v. Phelps, 562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011); Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).
A natural reading of the provision would seem to indicate that it is primarily concerned with verbal harassment, since it defines a subject about which unnecessary harassment is prohibited. It is difficult to imagine how one would physically “harass! ] a patient about firearm ownership.” See Fla. Stat. § 790.338(6) (emphasis added). However, even assuming that there are some situations in which the provision could be applied without involving speech, we think that on balance, the provision substantially regulates speech and so must survive some level of First Amendment scrutiny.[13]
In sum, we conclude that while the discrimination provision is a regulation of professional conduct with merely an incidental effect on speech, and thus does not implicate the First Amendment, the record-keeping, inquiry, and harassment provisions do regulate a significant amount of protected speech. Accordingly, we must proceed to determine what level of scrutiny the First Amendment demands of these provisions. See Lowe, 472 U.S. at 230, 105 S.Ct. at 2583 (White, J., concurring).
2.
Before we answer that question, however, we think it may be helpful to survey the landscape of professional speech. Two concepts orient our discussion: profession and relationship. A physician is not only a *887 member of the medical profession; he or she is also a fiduciary member of various physician-patient relationships. See, e.g., 61 Am.Jur.2d Physicians, Surgeons, and Other Healers § 141 (2012); Mangoni v. Temkin, 679 So.2d 1286, 1288 (Fla.Dist.Ct.App.1996). By exploring the distinct interests that drive and restrain government regulation in both areas, we can derive a framework by which to evaluate laws regulating professional speech.
We start with the commonsense observation that “[t]here is a difference, for First Amendment purposes, between ... professionals’ speech to the public at large versus their direct, personalized speech with clients.” Locke, 634 F.3d at 1191; see also Fla. Bar v. Went For It, Inc., 515 U.S. 618, 634, 115 S.Ct. 2371, 2381, 132 L.Ed.2d 541 (1995) (“Speech by professionals obviously has many dimensions.”). While a professional may speak on a variety of topics in a variety of contexts, only some of this speech falls under the category of “professional speech.” Consider two hypothetical scenarios. In the first, a physician meets with a patient in an examination room and explains the risks of a particular surgical procedure. This conversation is easily classified as professional speech. In the second scenario, the same physician speaks to a crowd at a rally, extolling the merits of a particular political candidate. It seems equally clear that while this speech is also uttered by a professional, it is not “professional speech.”
Phrased in terms of principles, we think it is safe to say that speech uttered by a professional in furtherance of his or her profession and within the confines of a professional-client relationship falls within any reasonable definition of professional speech. See King, 767 F.3d at 232 (defining professional speech as speech that “is used to provide personalized services to a client based on the professional’s expert knowledge and judgment”); Moore-King v. Cty. of Chesterfield, Va., 708 F.3d 560, 569 (4th Cir.2013) (finding “the relevant inquiry to determine whether to apply the professional speech doctrine” to be “whether the speaker is providing personalized advice in a private setting to a paying client”); see also Robert Post, Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech, 2007 U. Ill. L.Rev. 939, 949 (“[W]hen a physician speaks to a patient in the course of medical treatment, his opinions are normally regulable].... ”).
At the other end of the spectrum, speech uttered by a professional that is irrelative to the practice of his or her profession and outside a particular professional-client relationship likely falls beyond the purview of professional speech.[14] See Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring) (“Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ... becomes regulation of speaking or publishing as such, subject to the First Amendment’s command that ‘Congress shall make no law ... abridging the freedom of speech, or of the press.’”); cf. Sedivy v. State ex rel. Stenberg, 5 Neb.App. 745, 567 N.W.2d 784, 793 (1997) (suggesting in dicta that the First Amendment would bar the State from revoking a veterinarian’s license sole *888 ly because he expressed disagreement with government tax policies).
The difference between the first and second scenarios posed above turns on two factors: the professional effectivity of the speech — whether the physician is speaking in furtherance of the practice of medicine or not, and the relational context of the speech — whether the physician is speaking within a fiduciary relationship or not. Taken together, these factors account for the universe of speech uttered by a professional, dividing it into four categories. First, a physician may speak to the public, in furtherance of the practice of medicine. Second, a physician may speak to a client, in furtherance of the practice of medicine. Third, a physician may speak to a client, on a matter irrelative to the practice of medicine. Finally, a physician may speak to the public, on a matter irrelative to the practice of medicine.[15]
To illustrate, the physician’s speech in the first scenario above, to a patient about the risks of surgery, would fall in the second category: speech that furthers the practice of the physician’s profession and occurs within the confines of a physician-patient relationship. The physician’s speech to the crowd about a political candidate would fall in the fourth category: speech that is unrelated to the practice of the physician’s profession and occurs in the absence of any special relationship.
Speech between these two extremes can be located as well. Promotional or advertising speech by a physician to the public would fall within the first category: speech to the public for the purpose of furthering the physician’s practice. Giving general health advice to the public on a television talk show or in a newspaper column would also be in this category. See, e.g., Bailey v. Huggins Diagnostic & Rehab. Ctr., Inc., 952 P.2d 768, 773 (Colo.App.1997) (disal *889 lowing on First Amendment grounds a negligent misrepresentation claim against a dentist for publicly suggesting that mercury amalgam fillings are harmful and should be removed).
Conversely, conversation by a physician with a patient about their mutual love of golf would fall in the third category: speech unrelated to the practice of medicine but within the confines of a physician-patient relationship. A more sinister example of speech within this category is harassing or intimidating speech by a physician to a patient. See, e.g., In re Suspension or Revocation of License of Singh, No. A-2181-06T2, 2007 WL 1753567, at *1 (N.J.Super.Ct.App.Div. June 20, 2007) (affirming revocation of a physician’s license in part for repeatedly pressuring elderly patient to conceal the physician’s attempt to solicit a loan from her).
The utility of this two-dimensional model of professional speech comes to the fore when we attempt to identify the various governmental, societal, and individual interests that shape regulations of speech by professionals. The combination Of salient interests present when a physician speaks in furtherance of his profession is related to, but distinct from, the interests at play when a physician speaks as a fiduciary.
When government regulation of speech uttered by a professional is analyzed through the lens of the professional effec-tivity of the speech — whether it furthers or is unrelated to .the practice of a profession — the relevant interests are the government’s interest in regulating the profession for the protection of the public and the professional’s interest in speaking freely. Both interests vary depending on whether the speech effects the practice of a profession. The government’s interest is strongest when a professional speaks in furtherance of his profession and weakest when a professional speaks irrelative to his profession. The professional’s interest, conversely, is strongest when he speaks on matters unrelated to his profession and weakest when he speaks in furtherance of his profession.
When regulations of speech uttered by a professional are analyzed in terms of the audience — whether the speech occurs within the confines of a relationship of trust and confidence or'not — the relevant interests are slightly different. Within a fiduciary or quasi-fiduciary relationship, the government has a strong interest in policing the boundaries of the relationship to protect the weaker party from exploitation. This interest does not derive solely from some general principle that the government is obligated to protect the weak from predation by the strong; rather, the government’s interest is in ensuring that the societally beneficial function of these relationships — agent-principal, attorney-client, physician-patient, etc. — is not nullified due to exploitation by the fiduciary. Outside the confines of such relationships, the government’s interest in protecting the listener wanes, and instead the interest of the physician’s audience in obtaining information reaches its zenith.
Once this two-dimensional interplay of interests is set forth, our intuitive conclusions about whether certain kinds of speech by physicians constitute professional speech, and the proportionate latitude with which a state may regulate such speech, make sense. When a physician speaks to a patient in furtherance of the practice of medicine, not one, but two substantial state interests are implicated: regulation of the profession for the protection of the public, and regulation of the relationship for the protection of the patient and the benefit of society. Conversely, when a physician speaks to the public on a matter irrelative to the practice of medicine, neither state interest adheres with *890 any special force; instead, the countervailing interests — the physician’s interest in speaking freely and society’s interest in listening freely — come to the fore.
Another benefit of our two-dimensional framework is that it aligns with and illuminates the limited guidance the Supreme Court has provided on the subject of professional speech. Take, for example, promotional speech by professionals. Under our analysis, regulations of this type of speech fall in the first category, where the two primary interests at play are the state’s interest in protecting the public by regulating the profession, and society’s interest in the free flow of information. Notably, these are precisely the interests the Supreme Court has found relevant to analyzing regulations of professional advertising. See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 764, 766-68, 96 S.Ct. 1817, 1827, 1828-29, 48 L.Ed.2d 346 (1976) (characterizing the countervailing interests as society’s “strong interest in the free flow of commercial information,” and the state’s “strong interest” in protecting the public by maintaining “high professional standards”); accord Bates v. State Bar of Ariz., 433 U.S. 350, 364-79, 97 S.Ct. 2691, 2699-707, 53 L.Ed.2d 810 (1977); Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 454-460, 98 S.Ct. 1912, 1918-20, 56 L.Ed.2d 444 (1978).
The Supreme Court has also addressed, in passing, another category of speech by a professional — a regulation compelling physicians to discuss certain information with their patients about the risks of abortion and childbirth. Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884, 112 S.Ct. 2791, 2824, 120 L.Ed.2d 674 (1992) (joint opinion). Under our framework, this type of regulation falls at the intersection of two substantial governmental interests: regulation of the profession for the protection of the public, and regulation of the fiduciary relationship for the protection of the patient and the benefit of society. When one understands that both of the primary interests at play in this category cut in favor of government regulation, the Supreme Court’s succinct conclusion that the regulation implicated “the physi-eian[s’] First Amendment rights” but survived scrutiny as a “reasonable” regulation of the practice of medicine makes more sense. Id.
While the Court’s brief treatment in Casey does not provide much insight into how to analyze regulations of professional speech, or why the statute at issue survived First Amendment scrutiny,[16] the holding is helpful insofar as it is consistent with our conclusion that speech by a professional is best understood by evaluating it along two dimensions — whether it is uttered in furtherance of a profession and *891 whether it occurs within a professional-client relationship.
We need not mark out today the full metes and bounds of professional speech. It is sufficient to observe that speech by a physician that is uttered in furtherance of the practice of medicine and within the confines of a fiduciary relationship falls squarely within this category. As this is what the Act seeks to regulate, we conclude that it is a regulation of professional speech.[17]
With these principles in mind, we are now prepared to address the issue of the appropriate level of First Amendment scrutiny with which to evaluate the Act.
3.
All regulations of speech are not created equal in the eyes of the First Amendment. Laws regulating speech “receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it.” Stuart v. Camnitz, 774 F.3d 238, 244 (4th Cir.2014), cert. denied, 576 U.S. -, 135 S.Ct. 2838, — L.Ed.2d - (2015). Some statutory restraints on speech-most laws that restrict speech based on its content or viewpoint, for example-receive the “most exacting scrutiny,” Turner Broad. Sys, Inc. v. FCC, 512 U.S. 622, 642, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994), while others typically receive a less rigorous level of review, e.g., Ward, 491 U.S. 781, 109 S.Ct. 2746 (content-neutral regulations of the time, place, or manner of speech); Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (regulations of commercial speech); United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (regulations of noncommunicative conduct).
a.
As noted, the Supreme Court has yet to clarify the precise level of scrutiny with which to review government restrictions of professional speech. To bridge this gap, we must proceed via inference from the known to the unknown. The first piece of information we have is the level of scrutiny due government regulations of speech by a professional on a matter irre-lative to the practice of his profession and outside any particular relationship (in the fourth category above). In almost every instance, when a professional speaks in this context, his status as a professional is entirely incidental to his speech. When this is true, the government generally may not treat professional speakers differently *892 than nonprofessional speakers. See Pickup v. Brown, 740 F.3d 1208, 1227-28 (9th Cir.2014) (“[OJutside the doctor-patient relationship, doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection under the First Amendment.”); see also City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp’t Relations Comm’n, 429 U.S. 167, 176, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976) (“[The government] may not ... discriminate between speakers on the basis of their employment....”); Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Ill, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (“[T]eachers may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest....”).
Because the State’s interest in imposing content-based restrictions on speech is at low ebb when a professional speaks to the public irrelative to the practice of his profession, the State is required to justify any such regulation by demonstrating that it is “the least restrictive means of advancing a compelling government interest.” Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1258 (11th Cir.2005). This test is known as strict scrutiny. Id. So, for example, a law that prohibited physicians from discussing the subject of firearms with the public generally would assuredly be classified as a content-based restriction on speech, subject to strict scrutiny. Absent a showing that the law was necessary to further a compelling government interest, it would fall.
Another parcel of terra cognita is the level of scrutiny with which to evaluate regulations of speech by a professional to the public in promotion of his or her profession (in the first category above). The Supreme Court has noted that this type of speech “occurs in an area traditionally subject to government regulation,” and has therefore concluded that it warrants a lower level of protection under the First Amendment. Ohralik, 436 U.S. at 456, 98 S.Ct. at 1918. Correspondingly, the Court has set a lower bar by which to measure State regulation of such speech—intermediate, rather than strict scrutiny. Fla. Bar, 515 U.S. at 623, 115 S.Ct. at 2375. To survive this level of review, the State “must assert a substantial interest in support of its regulation” and demonstrate that the restriction “directly and materially advances” that interest without sweeping more widely than necessary. Id. at 624, 115 S.Ct. at 2376 (citing Cent. Hudson, 447 U.S. at 566, 100 S.Ct.at 2351).
The Court’s holdings in this area follow a clear trend. When the State seeks to impose content-based restrictions on speech in a context in which its regulatory interests are diminished, such as when a professional speaks to the public in a nonprofessional capacity, courts apply the most exacting scrutiny. When the State seeks to regulate speech by professionals in a context in which the State’s interest in regulating for the protection of the public is more deeply rooted, a lesser level of scrutiny applies.
We think that the restriction at issue here fits cleanly within the latter category, because both of the State interests implicated by the Act have deep regulatory roots. First, Courts have long recognized the authority—duty, even—of States to regulate the practice of professions to “shield[] the public against the untrustworthy, the incompetent, or the irresponsible.” Thomas, 323 U.S. at 545, 65 S.Ct. at 329 (Jackson, J., concurring). See, e.g., Goldfarb v. Va. State Bar, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975) (“We recognize that the States have a compelling interest in the practice of professions within their boundaries, and *893 that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.”); Watson v. Maryland, 218 U.S. 173, 176, 30 S.Ct. 644, 646, 54 L.Ed. 987 (1910) (“It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health.”).[18]
Moreover, the authority of the State to regulate relationships of a fiduciary character via the common law is, if anything, a more venerable proposition than the principle that the State possesses regulatory authority over professions. See, e.g., Twin-Lick Oil Co. v. Marburg, 91 U.S. 587, 588-89, 23 L.Ed. 328 (1875) (“That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings ... with the beneficiary or party whose interest is confided to his *894 care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others.”); see also 1 Joseph Story, Commentaries on Equity Jurisprudence § 218, at 235-36 (13th ed. 1886) (“In ... cases [in which there is a fiduciary relation between the parties,] the law, in order to prevent undue advantage from the unlimited confidence, affection, or sense of duty which the relation naturally creates, requires the utmost degree of good faith ... in all transactions between the parties. If there is any misrepresentation, or any. concealment of a material fact, or any just suspicion of artifice or undue influence, Courts of Equity will interpose.... ”); see generally Tamar Frankel, Fiduciary Law, 79-99 (2011) (tracing the roots of government regulation of fiduciary relations back to Hammurabi).
Indeed, one could make the case that when enacting laws governing the type of quintessential professional speech with which we are concerned here, the State has even more regulatory leeway than when regulating promotional speech by professionals, given the fiduciary context within which the former occurs. However, we need not determine conclusively whether a lesser form of scrutiny ever applies to regulations of professional speech, because in this case the outcome is the same whether a heightened intermediate scrutiny standard or some lesser level of judicial scrutiny is applied. Cf. Sorrell v. IMS Health Inc., —, U.S. -, -, 131 S.Ct. 2653, 2667, 180 L.Ed.2d 544 (2011) (finding it unnecessary to decide the precise level of scrutiny with which to evaluate speech restriction when the result was the same under either of the two possible standards).
b.
Plaintiffs contend that strict scrutiny is required for several reasons. First, they argue that the Act must satisfy strict scrutiny because it is a content-based restriction on speech — i.e., it restricts physicians from speaking about a certain topic: their patients’ status as firearm owners. See R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) (“Content-based regulations are presumptively invalid.”) We readily agree that the Act regulates speech on the basis of its content — “Plaintiffs want to speak to [their patients], and whether they may do so under [the Act] depends on what they say.” See Holder, 561 U.S. at 27, 130 S.Ct. at 2723-24. But this does not seal the Act’s fate.
As explained in R.A.V., the Constitution suffers content-based restrictions within certain limited categories of speech that society has determined do not merit full First Amendment protection. See 505 U.S. 377 at 382-83, 112 S.Ct. at 2542-43. Such regulations “may [not] be made the vehicles for content discrimination unrelated to their distinctly [regulable] conduct,” id. at 383-84, 112 S.Ct. at 2543, but intra-category content discrimination is permissible when the basis for it is the very reason the entire category of speech at issue receives less-than-full protection under the First Amendment, see id. at 388, 112 S.Ct. at 2545.[19] Thus “[a] State might *895 choose to prohibit only that obscenity which is the most patently offensive in its prurience ... [b]ut it may not prohibit ... only that obscenity which includes offensive political messages.” Id. at 388, 112 S.Ct. at 2546.
This is the case with the Act. The State made the commonsense determination that inquiry about firearm ownership, a topic which many of its citizens find highly private, falls outside the bounds of good medical care to the extent the physician knows such inquiry to be entirely irrelevant to the medical care or safety of a patient or any person. This accords neatly with the rationale for affording diminished protection to the entire category of professional speech — i.e., the State’s interest in regulating the profession to ensure that its citizens receive safe and effective care.[20]
Plaintiffs also suggest that the Act should trigger strict scrutiny because it is a speaker-based regulation of speech. To the extent that Plaintiffs seriously contend that this is an independent ground for strict scrutiny, Plaintiffs betray a fundamental misunderstanding of the doctrine of professional speech. It simply is not the case that every regulation of speech by professionals — all of which are, by definition, speaker-based — is presumptively unconstitutional. The Supreme Court has never framed its analysis in this way when scrutinizing regulations of speech by professionals. See, e.g., Thompson v. W. States Med. Ctr., 535 U.S. 357, 366-68, 122 S.Ct. 1497, 1503-04, 152 L.Ed.2d 563 (2002) (reviewing law restricting speech by licensed pharmacists and physicians); Fla. Bar, 515 U.S. at 622-24, 115 S.Ct. at 2375-76 (reviewing law restricting speech by lawyers); Edenfield v. Fane, 507 U.S. 761, 765-67, 113 S.Ct. 1792, 1797-98, 123 L.Ed.2d 543 (1993) (reviewing law restricting speech by accountants); Casey, 505 U.S. at 884, 112 S.Ct. at 2824 (reviewing law compelling speech by physicians) (joint opinion); Friedman v. Rogers, 440 U.S. 1, 8-14, 99 S.Ct. 887, 893-98, 59 L.Ed.2d 100 (1979) (reviewing law restricting speech by optometrists).
The reason why restrictions on speech by professionals generally do not offend the Constitution despite the fact that they discriminate on the basis of the speaker’s identity is essentially the same reason that restrictions on the basis of the content of the speech are permissible in this area. See R.A.V., 505 U.S. at 383, 112 S.Ct. at 2543. The basis for such restrictions is the very reason that the entire class of *896 speech gets diminished First Amendment protection. The State cannot effectively pursue its interest in regulating professions if it may not draw laws by reference to professional status.[21]
Finally, although Plaintiffs sprinkle fleeting references to viewpoint discrimination throughout their brief, we do not take them seriously to contend that the Act “targets ... particular views taken by speakers on a subject,” Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995), and for good reason. The Act plainly makes no distinction between speech favoring firearm ownership and speech disfavoring firearm ownership. The target of the Act’s restriction is speech of any viewpoint on the subject of firearm ownership that the physician knows to be completely irrelevant to the health and welfare of the patient or any other person.
c.
Accordingly, we will proceed under the rubric of intermediate scrutiny. Under this standard, we must uphold the Act if it “directly advances” a “substantial” State interest, and “is not more extensive than is necessary to serve that interest.” See Cent Hudson, 447 U.S. at 566, 100 S.Ct. at 2351.
In doing so, we find ourselves in good company. Three of our sister circuits have either applied intermediate scrutiny or strongly suggested that some intermediate level of review was appropriate when assessing regulations of professional speech. See Stuart, 774 F.3d at 248 (4th Cir.2014) (applying intermediate scrutiny to strike down regulation of physicians’ speech); King, 767 F.3d at 235 (3rd Cir.2014) (concluding that intermediate scrutiny was the appropriate standard by which to evaluate restrictions on professional speech); Pickup, 740 F.3d at 1227-28, 1231 (9th Cir.2014) (situating speech by professionals that occurs within the confines of a professional relationship at the midpoint on a continuum between speech by a professional to the public, which receives “robust protection under the First Amendment,” and speech by a professional which is “merely incidental” to the conduct of a profession, and “subject to only rational basis review”).
4.
When conducting an intermediate scrutiny analysis, we. look first to the substantiality of the State’s interest. See Fla. Bar, 515 U.S. at 624, 115 S.Ct. at 2376. We may not propose hypothetical governmental interests, as in a rational basis analysis; rather we must look to “the precise interests put, forward by the State....” Id. (quotation marks omitted).
Here, the State asserts that the Act serves several substantial interests, including safeguarding the privacy of pa *897 tients and their families, facilitating access to medical care, and preventing discrimination and harassment.[22] These interests “obviously factor[ ] into” the State’s “paramount ... objective,” Fla. Bar, 515 U.S. at 624, 115 S.Ct. at 2376, in the area of professional regulation — preserving its citizens from harmful or ineffective professional practices, see Fla. Stat. § 456.003(2) (stating the Florida legislature’s belief that “the preservation of the health, safety, and welfare of the public” is the only permissible objective of regulations of the health professions). Citing the “social, political, and moral controversy” surrounding firearm ownership in some circles, the State argues that inquiry about the subject is perceived by many to be highly intrusive. State’s Br. 33 (quoting Johnson v. Bryco Arms, 224 F.R.D. 536, 543 (E.D.N.Y.2004)). In response to concerns expressed by constituents, the State asserts, the legislature enacted the Act to shield patient privacy by limiting the solicitation of information about firearm ownership whenever it is unnecessary to anyone’s medical care or safety.[23] Id.
As noted above, the Supreme Court has deemed the State’s interest in regulating the practice of professions for the protection of the public not merely substantial, but “compelling.” Goldfarb, 421 U.S. at 792, 95 S.Ct. at 2016. Furthermore, the Supreme Court has also held that “the protection of potential clients’ privacy is a substantial state interest.” Fla. Bar, 515 U.S. at 625, 115 S.Ct. at 2376 (quoting Edenfield, 507 U.S. at 769, 113 S.Ct. at 1799). Although the Act was presumably motivated primarily by the privacy concerns of physicians’ existing patients, as opposed to potential patients, we see no material difference in the substantiality of the privacy interests at issue. We conclude that protecting the public by regulating the medical profession so as to safeguard patient privacy is a substantial state interest. Cf. Falanga v. State Bar of Ga., 150 F.3d 1333, 1344 (11th Cir.1998) (“Unquestionably, the interests that the State ... asserted are substantial, namely, protecting the public from vexatious conduct [by attorneys] ... [and] preventing invasions of privacy....”).
We move to the second step of the intermediate scrutiny analysis: whether the Act directly advances the State’s *898 substantial interest. To carry its burden here, the State must establish that the harms that the Act seeks to prevent “are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material, way.” Turner, 512 U.S. at 664,114 S.Ct. at 2470 (plurality opinion). While the State may not rely on “mere speculation or conjecture,” Eden-field, 507 U.S. at 770, 113 S.Ct. at 1800, it is not required “to present ‘empirical data ... accompanied by a surfeit of background information’ ” to justify its restriction. Falanga, 150 F.3d at 1340 (quoting Fla. Bar, 515 U.S. at 628, 115 S.Ct. at 2378). “Rather, the State[’s] ... case may rest ‘solely on history, consensus, and simple common sense[.]’ ” Id. (second alteration in original) (quoting Fla. Bar, 515 U.S. at 628, 115 S.Ct. at 2378). Further, “[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.” Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 391, 120 S.Ct. 897, 906, 145 L.Ed.2d 886 (2000).
We conclude that the State has met its burden of proof under this step of the analysis. As an initial matter, the record contains a number of anecdotes and references to constituent complaints regarding unwelcome questioning about firearm ownership from physicians. See supra note 2. Both the Supreme Court and this Court have noted that anecdotal evidence may support a conclusion that the challenged regulation directly and materially serves the State’s substantial interest. See Fla. Bar, 515 U.S. at 627, 115 S.Ct. at 2377 (describing the extensive anecdotal record presented by the State); Falanga, 150 F.3d at 1340 (noting anecdotal evidence of complaints by the public).
More importantly, however, given what the Act actually prohibits — record-keeping about firearm ownership only when the physician knows such information to be irrelevant, see supra part IV.A.1, inquiry about firearm ownership only when the physician lacks a good-faith belief that the information is relevant, see supra part IV. A.2, and harassment about firearm ownership only when the physician does not believe it necessary, see supra part IV. A.3 — we think that “simple common sense” furnishes ample support for the legislature’s decision. The State need not point to peer-reviewed studies or conduct extensive surveys to establish that proscribing highly intrusive speech that physicians themselves do not believe to be relevant or necessary directly advances the State’s interest in protecting its citizens from harmful or ineffective professional practices and safeguarding their privacy. This is particularly true given the facial plausibility of the legislature’s conclusion. See Nixon, 528 U.S. at 391,120 S.Ct. at 906.
Plaintiffs dispute this commonsense conclusion by arguing that existing federal and state laws sufficiently protect patient privacy.[24] As an initial matter, we note that these laws protect information after it has been disclosed to physicians; they do nothing to protect information from initial disclosure to physicians and their staff. More to the point, if the physician has no need for the information in the first place, then whether that information will be kept in confidence is irrelevant. The principal *899 harm targeted by the Act is the collection of information regarding, and harassment about, firearm ownership when that information is irrelevant to or unnecessary for the provision of medical care.
Plaintiffs further contend that because firearm ownership is heavily regulated, and individuals who wish to own a firearm must provide considerable personal information to the State, see Fla. Stat. § 790.065 (requiring prospective firearm buyers to submit a wide range of personal information and undergo a background check), patients should have no qualms about revealing their status as firearm owners to physicians, and thus the Act does not further patient privacy. Again, we find this argument to be inapposite. The fact that the State may possess information about resident firearm owners is utterly immaterial to whether or not physicians should have access to such information.[25] Moreover, here again, Plaintiffs mistake the actual working of the Act. The purpose of the Act, as we read it, is not to protect patient privacy by shielding patients from any and all discussion about firearms with their physicians; the Act merely requires physicians to refrain from broaching a concededly sensitive topic when they lack any good-faith belief that such information is relevant to the medical care or safety of their patients or others. Pointing to circumstances that allegedly diminish patients’ privacy per se is off-base.
Given the highly disparate power balance of the physician-patient relationship,[26] we find it to be clear that extracting private information from a patient, knowing such information to be irrelevant to the provision of medical care, is a real harm. In these circumstances, it is a matter of common sense that restricting unnecessary inquiry eliciting such information directly advances the State’s substantial interest .in regulating the medical profession to prevent harmful or ineffective medical care and safeguard patient privacy.
*900 Under the third and final step of the intermediate scrutiny analysis, we must determine whether the Act is more extensive than necessary to serve this interest. The State “must demonstrate narrow tailoring of the challenged regulation to the asserted interest — ‘a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.’ ” Greater New Orleans Broad. Ass’n, Inc. v. United States, 527 U.S. 173, 188, 119 S.Ct. 1923, 1932, 144 L.Ed.2d 161 (1999) (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989)).
Frankly, we read the Act to be precisely tailored to the State’s legitimate interests. The State has not made a sweeping ex ante judgment that all conversation and record-keeping about firearm ownership is inappropriate. The Act does not even represent a legislative conclusion that a subset of physician speech is categorically inappropriate. Instead, the Act’s prohibitions are directly and entirely coupled to physicians’ own good-faith judgments about whether such inquiry or record-keeping is medically appropriate in the circumstances of the particular patient’s case. See supra part -IV.A. If, as we have concluded, the State has a substantial interest in regulating the medical profession to prevent ineffective medical care, in this instance by protecting patients from unnecessary breaches of privacy, what narrower way to advance this interest than by impressing upon physicians the necessity that any inquiry or record-keeping about firearm ownership be the result of a genuine, subjective determination based on medical need? The Act does not falter on this ground.
Accordingly, we hold that the District Court erred by concluding that the Act violates the First Amendment. The Act withstands intermediate scrutiny as a permissible restriction of professional speech.
5.
Finally, we address the second of Plaintiffs’ First Amendment challenges: overbreadth. A statute is “overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” United States v. Stevens, 559 U.S. 460, 473, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010) (quotation marks omitted). “The over-breadth doctrine is ‘strong medicine’ that generally should be administered ‘only as a last resort.’ ” Locke, 634 F.3d at 1192 (quoting United States v. Williams, 553 U.S. 285, 293, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008)).
We reject this challenge for the same reasons that we rejected Plaintiffs’ conventional facial free speech challenge. The Act does not prohibit a substantial amount of protected speech because, even accepting that the Act “regulates and restricts every practitioner’s speech on the subject of firearms,” it only burdens speech that, as judged by the physician in good faith, lacks a sufficient nexus to the medical care or safety of a particular patient. As the State may validly legislate to ensure “the practice of professions within their boundaries,” Goldfarb, 421 U.S. at 792, 95 S.Ct. at 2016, and as no one argues that concededly irrelevant speech lies within the scope of good .medical practice, we hold that the Act is not overbroad.
C.
Concluding, we think it appropriate to make two points. First, although we hold today that the Act does not facially conflict with the requirements of the Constitution, we do not, by that holding, foreclose as-applied challenges. Plaintiffs remain free *901 to assert the First Amendment as an affirmative defense in any proceeding brought against them based upon speech made in the course of treatment that allegedly fell outside the bounds of good medical care. By rejecting Plaintiffs’ facial challenge to the Act, we are simply refusing to provide Plaintiffs with a declaration that such a defense will be successful.
Second, our decision should not be read as a -pronouncement on the Act’s “wisdom, need, [or] propriety.” Griswold v. Connecticut, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965). That is not our job. Our responsibility, simply and supremely, is “to decide cases agreeably to the Constitution and laws of the United States.” Id. at 530, 85 S.Ct. at 1707 (Stewart, J., dissenting) (quotation marks omitted). Having concluded that the Act does not offend either the First or the Fourteenth Amendments of the Constitution, we must uphold it.
V.
Accordingly, we REVERSE the District Court’s grant of summary judgment in favor of Plaintiffs, and VACATE the injunction against enforcement of the Act. SO ORDERED.

. 2011 Fla. Laws 112 (codified at Fla. Stat. §§ 381.026, 456.072, 790.338).

. For example, in a widely publicized incident that took place in Ocala, a pediatrician, during a routine visit, asked a patient’s mother whether she kept any firearms in her home. Because she felt that the question constituted an invasion of her privacy, the mother refused to answer. The pediatrician then terminated their relationship and advised the mother that she had thirty days to find a new doctor. Fla. H.R. Comm. ' on Health & Human Servs., *870 H.B. 155 (2011) Staff Analysis 2 (Apr. 7, 2011). See also Fred Hiers, Family and pediatrician tangle over gun question, Ocala Star-Banner, July 24, 2010, http://www.ocala.com/ article/20100724/articles/7241001.
In another incident, physicians refused to provide medical care to a nine-year-old "because they wanted to know if [the child's family] had a firearm in their home.” Audio CD: Regular Session Senate Floor Debate on HB 155, held by the Florida Senate (Apr. 27-28, 2011) at 26:32 (remarks of Sen. Evers) (on file with Florida Senate Office of the Secretary). In another example, a legislator stated that, during an appointment with his daughter, a pediatrician asked that the legislator remove his gun from his home. Audio CD: Regular Session House Floor Debate on HB 155, held by the Florida House of Representatives (Apr. 26, 2011) at 26:20 (remarks of Rep. Artiles) (on file with Florida House of Representatives Office of the Clerk). Another legislator reported a complaint from a constituent that a health care provider falsely told him that disclosing firearm ownership was a Medicaid requirement. Id. at 13:40 (remarks of Rep. Brodeur). That legislator also relayed a complaint about a mother who was separated from her children while medical staff asked the children whether the mother owned firearms. Id.
Further incidents are recounted in a Joint Statement of Undisputed Facts filed by the parties in the District Court below. Wollschlaeger v. Farmer, No. 1:11-CV-22026 (S.D.Fla. Nov. 11, 2011), Doc. 87.

. The full text of the challenged provisions is as follows:
(1) A health care practitioner licensed under chapter 456 [of the Florida Statutes] or a health care facility licensed under chapter 395 [of the Florida Statutes] may not intentionally enter any disclosed information concerning firearm ownership into the patient’s medical record if the practitioner knows that such information is not relevant to the patient’s medical care or safety, or the safety of others.
(2) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient’s right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient’s medical care or safety, or the safety of others, may make such a verbal or written inquiry....
(5) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition.
(6) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient’s legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination....
Fla. Stat. § 790.338.
The Act also contains related provisions concerning emergency medical personnel and insurance companies, affirming the right of patients to decline to answer physician questions, and affirming that the Act does not alter existing law regarding a physician’s authorization to choose patients. § 790.338(3), (4), (7). Plaintiffs do not appear to challenge these provisions, and, as the District Court *871 held, because these provisions do not apply to physicians or do not regulate any conduct by physicians, Plaintiffs lack standing to challenge them.

. The District Court granted the State’s motion for summary judgment with respect to the provisions of the Act that neither apply to practitioners nor regulate any conduct by physicians, § 790.338(3), (4), (7), finding that Plaintiffs lacked standing to challenge these provisions. Wollschlaeger v. Farmer, 880 F.Supp.2d 1251, 1258 (S.D.Fla.2012).

. Plaintiffs' Complaint lays out the specifics of individual physicians’ practices regarding firearm inquiries and safety counseling. For example, prior to passage of the Act, Dr. Wollschlaeger asked his patients to complete a questionnaire that included questions regarding firearm ownership, and routinely orally asked patients whether they owned firearms if other risk factors were present — such as when patients had children in the home, were suffering from addiction, depression, or suicidal ideation, had an unstable family environment, or were involved in a domestic-violence situation — to provide firearm safety counseling tailored to the patient’s circumstances. After passage of the Act, Dr. Wollschlaeger has removed the firearms-related questions from his questionnaire and no longer orally asks questions regarding firearm ownership or discusses firearms as part of his standard preventative counseling.
The other physicians who are party to this suit have limited their practice of asking questions and providing counseling about firearm safety, but still do so to varying degrees. For example, prior to passage of the Act, Dr. Schaechter and Dr. Schechtman routinely asked their patients questions regarding firearm ownership and entered related information into their medical records. They have continued this practice even after passage of the Act because they believe in good faith that such questions and information are relevant to their patients’ care. However, they now refrain from asking follow-up questions when patients or their parents seem upset by the initial screening question, when, prior to passage of the Act, they would not have refrained. Similarly, Dr. Gutierrez continues to use a patient questionnaire that includes a question about firearm ownership, but has resolved to refrain from asking any follow-up questions should a patient initially appear disinclined to discuss the topic. Dr. Sack has ended his previous practice of beginning his firearm safety counseling by asking patients whether they have a firearm in the house. However, he has continued to provide firearm safety counseling, framing it in hypothetical terms not tailored to his patients’ individual circumstances. Dr. Fox-Levine has, since passage of the Act, removed questions regarding firearm ownership from her intake questionnaire, but continues to advise some patients about firearm safety, framing her advice in hypothetical terms.

. We note that the Act does not provide for criminal penalties, but only disciplinary action by the Board. Nevertheless, for standing purposes, the threat of disciplinary action may be sufficient. See Harrell v. The Fla. Bar, 608 F.3d 1241, 1248, 1260 (11th Cir.2010) (finding an attorney had standing to challenge the state bar’s attorney advertising rules when the consequence for noncompliance was disciplinary action, such as disbarment).

. We acknowledge that the harassment and discrimination provisions of the Act in particular, § 790.338(5) and (6), prohibit conduct that may involve little to no speech. Nevertheless, Plaintiffs claim self-censorship as a result of all four challenged provisions of the Act. As all four challenged provisions regulate conduct that arguably involves speech, this is sufficient for standing purposes. We need not, of course, evaluate the merits of these claims at the standing stage.

.We do not accept Plaintiffs’ argument that construing the inquiry provision’s "should refrain” language as hortatory would render meaningless the portion of the provision allowing physicians to nevertheless make firearm inquiries when doing so would be relevant to care and safety. See Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 1566, 173 L.Ed.2d 443 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.” (quotation marks omitted)). Even if we were to construe the inquiry provision as a mere recommendation that physicians refrain from inquiring about firearms, it is perfectly reasonable that the legislature may wish to withdraw this recommendation should the inquiry be relevant in a given case. Nevertheless, we find that the inquiry clause is not a mere recommendation, and our rejection of Plaintiffs' argument does not alter the result of our standing inquiry.

. The State does not renew on appeal its argument that Plaintiffs’ claims are not ripe. Thus, we will not address the issue in detail.

. Plaintiffs' challenge is limited to these four provisions. Accordingly, unless context demands otherwise, future references to the Act should be understood to refer only to these provisions.

. Plaintiffs have not cross-appealed .the District Court’s holding that the discrimination provision, § 790.338(5), is not void for vagueness. As a result, we need not address their argument that what constitutes "discrimination” under the provision is unclear.

. The First Amendment's prohibition is applied against the States through the Fourteenth Amendment’s Due Process Clause. Schneider v. New Jersey, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939); see also Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

. We note that Plaintiffs bring two types of facial First Amendment challenges to this provision: a traditional facial challenge, which can succeed only if "no set of circumstances exists under which the Act would be valid,” Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott, 717 F.3d 851, 863 (11th Cir.2013) cert. denied, - U.S. -, 134 S.Ct. 1877, 188 L.Ed.2d 912 (2014) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)), and an over-breadth challenge, "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” United States v. Stevens, 559 U.S. 460, 473, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010) (quotation marks omitted).
If there are some plainly legitimate applications of the harassment provision, such as to physical harassment, that would seem to doom the first of Plaintiffs' facial First Amendment challenges. This is not necessarily dispositive, however, because a substantial number of its applications may still be found to be unconstitutional in an overbreadth analysis.

. This does- not mean that the speech cannot be regulated, but rather that such speech is, for most purposes, indistinguishable from speech by the average citizen. Therefore, any government regulation of such speech would generally be subject to a conventional First Amendment analysis. See Pickup v. Brown, 740 F.3d 1208, 1227-28 (9th Cir.2014).

. It may be helpful to think about these four categories in the form of a grid, like so:
[[Image here]]

. As at least one commentator has noted, Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), and Whalen v. Roe, 429 U.S. 589, 97 S.Ct 869, 51 L.Ed.2d 64 (1977), the two cases the Court cited as support for its holding, point in opposite directions on the issue of the appropriate level of scrutiny. Daniel Halberstam, Commercial Speech, Professional Speech, and the Constitutional Status of Social Institutions, 147 U. Pa. L.Rev. 771, 773-74 (1999). The reference to Wooley would seem to indicate that heightened scrutiny is appropriate, given that the Court in Wooley struck down a regulation of speech because it was not narrowly tailored to a “sufficiently compelling'' government interest. See 430 U.S. at 716-717, 97 S.Ct. at 1436. On the other hand, the passage cited from Whalen suggests that States' authority to regulate the practice of medicine is subject only to basic due process considerations. See 429 U.S. at 603, 97 S.Ct. at 878. “To fuse these two models in a shorthand formulation provides little indication of how to resolve any professional’s First Amendment claim other than the precise one at issue in Casey." Hal-berstam, supra, at 774.

. There can be no argument that Plaintiffs view inquiries about firearm ownership as a matter of preventative care — i.e., in furtherance of the practice of medicine — or that they wish to raise these issues with their patients— i.e., within the context of a fiduciary relationship. See Plaintiffs’ Br. 3-4. Indeed, stripped to its essentials, Plaintiffs’ theory of the case appears to be that the Act prohibits them from speaking to their patients in furtherance of the practice of medicine, but that the State’s objective in passing the Act was to prohibit them from speaking on a matter irre-lative to the practice of medicine, and that it will seek to punish them for doing so.
We do not understand Plaintiffs to argue that they have a First Amendment right to speak to their patients within the examination room on matters irrelative to the practice of medicine. So, because we find that the Act was tailored so as to permit inquiry about firearms in all circumstances in which the physician believes in good faith that such information is relevant to the health or safety of any individual, see supra part IV.A.2, we need not — indeed, we cannot — address the propriety of applying the Act to prohibit physicians from discussing matters irrelative to their patients’ health or safety. Because Plaintiffs concede that the Act regulates speech uttered in furtherance of the practice of medicine, we proceed to analyze it as such.

. Pursuant to that authority, States commonly enact laws touching on what professionals may say. Florida, for example, has quite a few regulations implicating speech by physicians. See, e.g., Fla. Stat. § 381.026 (requiring physicians to communicate various information to patients on request, including: the physician’s “name, function, and qualifications”; information concerning the patient’s "diagnosis, planned course of treatment, alternatives, risks, and prognosis”; various financial information; and a written "statement of patient rights and responsibilities”); id. § 381.986 (requiring physicians who prescribe low-THC cannabis to provide information to patients about the potential risks and side effects of, alternatives to, and effectiveness of the treatment, as well as imposing various recording and reporting requirements); id. § 456.41 (requiring physicians offering complementary or alternative health care treatments to communicate to the patient, orally or in writing, "the nature, benefits, and risks of the treatment,” as well as "the practitioner's education, experience, and credentials in the field,” and to indicate the provision of such information in the patient’s medical records); id. § 458.324 (requiring physicians treating patients diagnosed with or at a high risk for breast cancer to provide various information about treatment alternatives to the patient and document the provision of such information in the patient's medical records); id. § 458.325 (requiring physicians, prior to administering electrocon-vulsive or psychosurgical procedures to a patient, to disclose information regarding the procedure); id. § 458.331 (listing various grounds for disciplinary action, including "the use of fraud, intimidation, undue influence, or a form of overreaching or vexatious conduct” to solicit patients; "failing to keep legible ... medical records” that identify responsible physicians "by name and professional title” and that include sufficient information to "justify the course of treatment of the patient”; and “failing ... to provide patients with information about their patient rights and how to file a patient‘complaint”); Fla. Admin. Code R. 64B8-9.007 (requiring surgeons to "verbally confirm the patient’s identification, the intended procedure and the correct surgical/procedure site” before operating, and to document such confirmation in the patient’s medical records); id. R. 64B8-9.008 (proscribing all "verbal behavior” between a physician and a patient that could “reasonably be interpreted as romantic involvement with [the] patient”); id. R. 64B8-9.013 (mandating detailed information physicians must record prior to and during the course of prescribing controlled substances for a patient; requiring physicians to use a "written treatment plan” with specific content; requiring physicians to "discuss the risks and benefits of the use of controlled substances with the patient”); id. R. 64B8-9.0141 (prohibiting physicians from "providing] treatment recommendations ... via electronic or other means” unless the physician completes a “documented patient evaluation,” discusses "treatment options and the risks and benefits of treatment” with the patient, and “[m]aint[ains] ... contemporaneous medical records”); id. R. 64B8-11.001 (imposing various restrictions on physician advertising); id. R. 64B8-11.002 (prohibiting licensed physicians from representing in their promotional communications that they “are HIV negative or free from AIDS,” or implying or stating "that any other licensee is or may be a greater risk to patients due to a failure or refusal to provide similar advertising or notice”); id. R. 64B8-11.003 (requiring licensed physicians to identify themselves as such to their patients).

. In R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992), the Supreme Court explicitly addressed only those categories of speech that have so little value that they may be completely proscribed, such as obscenity, defamation, and fighting words. See id. at 382-84, 112 S.Ct. at 2543. We can think of no reason why the Court’s reasoning in R.A.V. should not extend, perforce, beyond wholly proscribable categories of speech to those categories which, although they may not be of so little *895 value as to warrant flat bans, have traditionally been deemed to merit a diminished level of First Amendment protection, such as commercial speech, or professional speech. King v. Governor of N.J., 767 F.3d 216, 236-37 (3d Cir.2014). Indeed, the Court indicated as much when it used several commercial speech cases to illustrate how the doctrine worked in practice. See R.A.V., 505 U.S. at 388-89, 112 S.Ct. at 2546. We therefore proceed with this understanding.

. It may be contended that the basis for the State’s restriction is political rather than medical in nature, and that as a result, the Act does not fall within R.A.V. 's exception. This argument might have legs if the Act had simply prohibited all discussion of firearms by physicians, or if it had restricted such speech on the basis of a particular viewpoint. Instead, the Act affords physicians wide latitude to speak about firearms — to inquire, to record, even, in some instances, to harass — right up to the point where the physician knows, or no longer believes in good faith, that such speech is relevant to anyone’s medical care or safety. See supra part IV.A. We think that by defining the boundaries of permissible speech in terms of medical necessity, the State evinced scrupulous heed of the distinction between an impermissible regulation of speech on the basis of content unrelated to the category in which it falls, and an appropriate regulation of speech on a basis that is consistent with the reasons the entire category may be regulated.

. As the Supreme Court noted in R.A.V., however, this does not give the State free rein to turn regulations of professional speech into "vehicles for content discrimination unrelated to their distinctly [regulable] content.” 505 U.S. at 383-84, 112 S.Ct. at 2543. We think there exists a nexus requirement in the area of speaker-based restrictions analogous to that present in the area of content-based restrictions. Thus, while a State would be free to restrict the speech of all physicians, or even of certain sub-categories of physicians, provided its rationale was consistent with “the very reason the entire category of speech at issue” receives less than full protection under the First Amendment, it could not, consistent with the First Amendment, impose a restriction on the speech of all physicians who are registered Democrats, because such a restriction would be entirely unrelated to the interest justifying greater regulatory leeway in this area — that of ensuring that medical professionals provide safe and effective medical care. See id. at 388, 112 S.Ct. at 2545.

. Because we ultimately conclude that the State’s proffered interest in patient privacy is substantial, we find further discussion of the State's alternative interests unnecessary. See Fla. Bar v. Went For It, Inc., 515 U.S. 618, 624 n. 1, 115 S.Ct. 2371, 2376, 132 L.Ed.2d 541 (1995) (noting that the State need not "point to more than one interest in support of its ... restriction; a single substantial interest is sufficient to satisfy Central Hudson's first prong”).

. Some of the complaints received by the Florida legislature prior to the passage of the Act reflect constituents’ concerns that their firearm-ownership status, once entered into their medical record, may be disclosed to third parties. Plaintiffs contend that this is an irrational fear, and that existing law provides sufficient safeguards for patient privacy. See infra part IV.A.4, at 72.
We need not speculate as to the reasons patients might be uncomfortable disclosing their firearm-ownership status to their physicians, but we note that a patient might wish to keep any number of subjects private when discussion of those subjects is not relevant to his or her medical care. For example, a patient may not wish to disclose his or her religious or political affiliations, sexual preferences, or bank account balance to a physician. The Act merely circumscribes the unnecessary collection of patient information on one of many sensitive subjects. It does so as a means of protecting a patient's ability to receive effective medical treatment without compromising the patient's privacy with regard to matters unrelated to their medical care or safety, or the safety of others.

. Under regulations promulgated pursuant to the federal Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936, covered health care providers may not disclose patient health information except to an enumerated list of entities. 45 C.F.R. § 164.502. Florida law also provides that a patient's medical records must be kept confidential and enumerates only limited circumstances in which a health care provider may share patient records with a third party. Fla. Stat. § 456.057(7)(a).

. Unlike in the Fourth Amendment, there is no "third-party exposure” exception that somehow mitigates the State’s interest in protecting the privacy of its citizens. Cf. Smith v. Maryland, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220 (1979) (explaining that for the purposes of the Fourth Amendment, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties”).

. One scholar has summarized the power dynamics of the physician-patient relationship thusly:
[R]esearch shows [that] the purpose and structure of the doctor-patient relationship vest physicians with immense authority and power in the eyes of patients. Physicians’ authority derives from their superior knowledge and education, their prestigious social and economic status, and the “charismatic authority” that derives from their symbolic role as conquerors of disease and death.... The confluence of these factors leads to an institutionalization of physicians’ “professional dominance” within the structure of doctor-patient interaction that in itself legitimizes physician expressions.
In the face of this dominance, patients suspend their critical faculties and defer to physicians' opinions. Patients’ disempowered position stems from a number of factors, including lack of medical knowledge, the anxiety that accompanies illness, and the need to believe that physicians have the power and competence needed to cure them.
These structural inequities also counteract patients' ability to question physicians and redirect the course of a conversation, even if patients have an acute desire to acquire information. Moreover, socio-economic differences between doctor and patient, particularly differences of race, class, gender, or age, further impede communication.
Paula Berg, Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice, 74 B.U. L.Rev. 201, 225-28 (1994) (footnotes omitted).